**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**TMFS HOLDINGS, LLC, FINANCIAL ENGINES ADVISORS, LLC, AND FINANCIAL ENGINES, INC.,**

**Plaintiffs,**

**v.**

**SCOTT M. CAPACE AND JOSEPH G. ZINSEL,**

**Defendants.**

**Case No. 17-2063-JAR-GLR**

**MEMORANDUM AND ORDER**

Plaintiffs TMFS Holdings, LLC, Financial Engines Advisors, LLC, and Financial Engines, Inc. filed this action in Johnson County, Kansas District Court on January 31, 2017, alleging breach of contract and misappropriation of trade secrets under Kansas law by two former employees that resigned on January 25, 2017, Defendants Scott Capace and Joseph Zinsel. Plaintiffs filed a motion for temporary restraining order along with the Petition, and that motion was set for hearing in state court on February 2, 2017. But on February 2, Defendants removed the case on the basis of diversity jurisdiction.[1] This matter is before the Court on Plaintiffs' Motion for Temporary Restraining Order (Doc. 6), which was refiled after removal. The motion is fully briefed and the Court heard argument on February 6, 2016. The Court has considered the parties' submissions and their oral argument and is prepared to rule. For the

[1]The parties advise the Court that a parallel case was filed by Defendants in Louisiana state court and removed to the United States District Court for the Eastern District of Louisiana. Defendants moved for a temporary restraining order in that action, which was denied on February 3, 2017. That court directed the parties to brief the issue of whether it should stay proceedings in deference to this matter. The briefs are due today. *Capace v. TMFS Holdings*, No. 17-919, Doc. 6 (E.D. La. Feb. 3, 2017).

reasons explained more fully below, the Court grants Plaintiffs' motion for a temporary restraining order.

## I. Background

The following facts are alleged in the Petition and attachments thereto, or are contained in Capace's declaration, attached to Defendants' response. Plaintiff Financial Engines, Inc. operates a nationwide system of investment advisers, including a business formerly known as The Mutual Fund Store. The Mutual Fund Store was founded in 1996 in the Kansas City area, and eventually became part of TMFS Holdings, LLC, which Financial Engines acquired in February 2016. Plaintiffs refer to themselves, as well as "their direct and indirect subsidiaries, including Plaintiff FE Advisers" as "TMFS." Defendants are former employees of Plaintiffs, who started their employment with TMFS in November 2011 and January 2012, respectively.[2] At the time of their resignations, Defendants held the title Senior Vice-President, Financial Planning. Defendants each entered into the same standard language employment agreement sent to them by TMFS. Capace's agreement is undated; Zinsel's agreement is dated January 11, 2012. By the end of 2016, Capace was managing approximately $87 million and Zinsel was managing approximately $50 million in Assets Under Management for TMFS. They collectively generated over $1 million in revenue for TMFS over the last two years of their employment.

Defendants resigned on January 25, 2017, and started a new investment-advisory firm called Open Source Investments, LLC ("Open Source"). Plaintiffs allege that Defendants took customer lists and solicited at least two of TMFS's former clients in violation of restrictive covenants included in their identical employment agreements. Section 2 of the agreement

[2] Capace previously owned Mutual Fund Store franchises in Louisiana before he became a TMFS employee in November 2011.

prevents Defendants from using or disclosing TMFS's confidential information, and requires them to promptly return confidential and proprietary information at the end of their employment. Section 3 of the agreement prohibits Defendants from soliciting, diverting, or taking away TMFS's customers for one year after their date of resignation. It also prevents them from causing or attempting to cause TMFS customers to terminate or reduce their relationship with TMFS, and from soliciting TMFS employees to work for a competitor. The agreement provides for injunctive relief in the event of breach or threatened breaches of sections 2 or 3.

Defendants' resignation letters, attached to the Petition, state: "In accordance with Broker Recruiting Protocol, I am taking a paper copy of my clients' names, addresses, phone numbers, and email addresses. Also in accordance with the Protocol I am leaving an exact copy of this information with the office."[3] The Petition alleges that Capace told TMFS that he scrubbed his TMFS computer prior to leaving. Defendants started working for Open Source one week before they resigned. Open Source will provide independent wealth management services, the same types of services offered by TMFS. Defendants contacted their former clients by email, advising them that they left TMFS, that the clients are still enrolled with TMFS, and that they have formed a new company, which "can offer a better array of services and products best suited for our clients' investments needs through our own investment advisory firm." They provided their new contact information at Open Source to these customers. At least two of TMFS's clients are in the process of switching their accounts to Open Source.

Capace's declaration states he and Zinsel took hard copy lists of their own clients, as described in their resignation letters. Capace's declaration also states that, "on January 28, 2017, Joseph Zinsel and I returned all paper copies of the client list to Financial Engines/TMFS by

---

[3]Doc. 1-1 at 42–43.

Federal Express and destroyed the electronic copies of the list including any documents using information from the list."[4]

Defendants' employment agreement contains a forum selection clause in section 9, specifying that Kansas law will apply to disputes relating to the contract. The contracts were performed in whole or in part in Kansas. TMFS provided Defendants with administrative, regulatory, and customer-related support and information (including confidential, competitively-valuable information) from Kansas; Capace repeatedly traveled to Kansas in connection with his employment; TMFS provided Zinsel with training in Kansas; and Defendants allegedly took customer lists held in servers located in Kansas. Defendants live and work in Louisiana. They were recruited by TMFS in Louisiana and most of their clients are located in that state.

## II. Standard

A TRO preserves the status quo and prevents immediate and irreparable harm until the court has an opportunity to pass upon the merits of a demand for preliminary injunction.[5] Where the parties have notice of and an opportunity to respond to a motion for TRO, courts generally apply the standards governing issuance of preliminary injunctions.[6] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[7] This standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an

---

[4]Doc. 8-1 ¶ 20.

[5]*Flying Cross Check, LLC v. Central Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001).

[6]*See Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993).

[7]*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

injunction."[8] A relaxed standard applies if the movant can show that the harm and public interest factors "tip strongly in its favor."[9] If the movant can make this showing, it can meet the likelihood of success on the merits prong "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[10]

## III. Discussion

### A. Irreparable Harm

To constitute irreparable harm, the injury "must be both certain and great."[11] It "is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'"[12] "Loss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm."[13] On the other hand, wholly conclusory statements alone will not constitute irreparable harm.[14]

Defendants argue that there is no indication of irreparable harm to Plaintiffs if this Court does not issue a temporary restraining order, and that Plaintiffs' claims are based on wholly conclusory statements. The Court disagrees. Plaintiffs allege that Defendants were managing tens of millions of dollars' worth of Assets Under Management for TMFS at the time of their

---

[8] *Id.* at 21. The injunction sought in this case seeks to preserve the status quo, so the heightened standard employed for disfavored injunctions does not apply. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam), *aff'd*, 546 U.S. 418 (2006).

[9] *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

[10] *Id.* (footnote omitted).

[11] *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[12] *Id.* (quoting *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980)).

[13] *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d, 1197, 1205 (D. Kan. 2003).

[14] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).

resignations, and collectively generated over $1 million in revenue for TMFS. And case law from the Tenth Circuit explicitly acknowledges that loss of customers and goodwill may constitute irreparable harm. This is precisely the type of harm claimed by Plaintiffs, and for which the restrictive covenants in Defendants' employment agreements seek to protect. The Court easily finds that this is the type of damage that cannot be remedied after a final determination on the merits, or with damages. Indeed, the Tenth Circuit has recognized that "[o]ne such situation in which damages may not fully compensate a plaintiff is when the business at issue 'is based on personal contacts and a knowledge of the special needs and requirements of customers, a fact which complicates any damage estimate.'"[15] The Court further finds that Plaintiffs' claims of harm are not merely conclusory—they submitted emails showing Defendants communicated with their former clients, and Defendants have admitted multiple times that they took with them their clients' names and contact information when they resigned. In fact, Defendants maintain that they were entitled to this information under industry standards. Plaintiffs have met their burden of demonstrating irreparable harm.

**B. Balance of Harms and Public Interest**

The Court must weigh the irreparable harm to Plaintiffs without the injunction against the harm to Defendants if the injunction issues. Defendants characterize their harm as "hardship that Defendants and their families would suffer if they are denied the protections afforded to Louisiana employees, and enjoined from working as financial advisors in the state and area where they have lived and worked their entire lives."[16] But this mischaracterizes section 3 of the employment agreement. The restrictive covenant is a nonsolicitation clause; it does not prohibit

[15] *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191–92 (10th Cir. 2009) (quoting *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990)).

[16] Doc. 8 at 15.

Defendants from working as financial advisors in Louisiana. Sections 2 and 3 restrict the information Defendants could take with them when their employment ends, and prevents them from soliciting TMFS customers, or causing them to leave TMFS. Defendants are permitted to work as financial advisors so long as they develop new client relationships. Such hardship does not outweigh the irreparable harm to Plaintiffs without a TRO—a loss of goodwill that could not be compensated through monetary damages. The TRO freezes the status quo until the Court can determine whether Defendants' choice of law argument, and thus their entitlement to "the protections afforded to Louisiana employees," is dispositive without risking further loss of customers and goodwill to Plaintiffs.

The Court also finds that the TRO is in the public interest. Generally, there is a public interest in upholding enforceable contracts.[17] Here, the Court determines that a TRO is an appropriate remedy to freeze the status quo by enforcing the parties' contracts based on the forum selection clause in those contracts. Indeed, the parties' contracts provide for injunctive relief in the event of a breach or a threatened breach. The Court finds that both the balance of harms and the public interest factors tip strongly in Plaintiffs' favor.

**C. Likelihood of Success on the Merits**

Because the Court finds that the balance of harms and public interest factors tip strongly in their favor, a relaxed standard applies to the likelihood of success on the merits prong of the TRO analysis. Plaintiffs base their request for injunctive relief on their breach of contract claim under Kansas law. Defendants only challenge to whether Plaintiffs are likely to succeed on the merits of this claim is that the choice of law provision in section 9 of the agreement is unenforceable. "[A] federal court sitting in diversity must apply the substantive law of the state

---

[17] *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc*., 86 F. Supp. 2d 1102, 1109 (D. Kan. 2000); *Hearton, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

in which it sits, including the forum state's choice-of-law rules."[18] Both parties invite the Court to consider the Kansas Supreme Court's decision in *Brenner v. Oppenheimer & Co.*[19] In that case, the court was called upon to consider whether a choice of law provision specifying that New York law would govern standard form client agreements for certain brokerage accounts is enforceable given Kansas's strong public policy favoring securities regulation.[20] As a threshold matter, the court discussed the constitutional limitations on choice of law questions, recognizing that choice of law must not be "arbitrary nor fundamentally unfair," and thus, Kansas must have "significant contact or significant aggregation of contacts."[21] The court found sufficient minimum contacts with the State of Kansas to satisfy that constitutional inquiry.[22]

Next, the court determined that there was an actual conflict between New York and Kansas securities law requiring it to determine which law should govern the dispute.[23] The court recited the general rule under Kansas law that a contractual choice of law provision controls.[24] A narrow exception applies to this general rule where enforcing a contractual choice of law provision "engenders a result contrary to public policy."[25] The brokerage firm urged the court to apply the test used in *Altrutech, Inc. v. Hooper Holmes, Inc.*, that "the enforceability of a contractual choice-of-law provision turns on whether the forum selected bears a reasonable relation to the contract at issue," which is found in the Restatement (Second) of Conflict of

[18]*Boyd Rosen & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352–53 (10th Cir. 1997).

[19]44 P.3d 364 (Kan. 2002).

[20]*Id.* at 371.

[21]*Id.* at 372 (quoting *Sys. Design v. Kan. City P.O. Emps. Cred. Union*, 788 P.2d 878, 881 (1990)).

[22]*Id.*

[23]*Id.* at 373.

[24]*Id.* at 375.

[25]*Id.*

Laws.[26] But the Kansas Supreme Court declined, stating that *Altrutech* did not consider whether the public policy exception to Kansas choice of law rules applies. *Brenner* neither endorsed nor applied that test. Ultimately, the court determined that Kansas public policy strongly favors the regulation of securities transactions, and thus application of New York law, which does not allow redress for the sale of unregistered securities, would violate Kansas public policy.[27] The court found the forum selection clause invalid under the public policy exception.[28]

Defendants in this case mistakenly focus on language in *Brenner* discussing the *Altrutech* reasonable relation standard and argue that this test determines whether a choice of law provision should be enforced under Kansas law. The Court acknowledges that the reasonable relation test has been recited and applied in several past opinions in this district.[29] But none of the cited cases invalidated a forum selection clause on these grounds, nor provide any analysis of a reasonable relation test under the Restatement (Second) Conflict of Laws.[30] The Court has reviewed the cases cited by the parties and agrees with Plaintiffs that this language appears to derive from a prior Kansas case construing the UCC.[31]

---

[26]*Id.* (discussing *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F. Supp. 2d 1269, 1273 (D. Kan. 1998)).

[27]*Id.* at 377–81.

[28]*Id.* at 380.

[29]*See, e.g.*, *Altrutech*, 6 F. Supp. 2d at 1273; *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, No. 10-1334-JAR, 2012 WL 5987473, at *3 (D. Kan. Nov. 29, 2012), *rev'd on other grounds*, 751 F.3d 1157 (10th Cir. 2014); *BHC Dev., L.C. v. Bally Gaming, Inc.*, 985 F. Supp. 2d 1276, 1285 (D. Kan. 2013) (citing *Nat'l Equip. Rental, Ltd. v. Taylor*, 587 P.2d 870, 872 (Kan. 1978) (applying the U.C.C.)).

[30]Defendants also mistakenly suggest that the Due Process standard for determining whether minimum contacts exist for the choice of law provision to pass constitutional muster, is "consistent with" the Restatement (Second) of Conflict of Laws, which provides a test for determining the validity of a choice of law provision. *Brenner* does not discuss these tests in tandem; they are separate inquiries. *Compare Brenner*, 44 P.3d at 372 (discussing the constitutional inquiry before considering whether an actual conflict exists), *with* 44 P.3d at 374–75 (reciting the reasonable relation test as it has been applied in two federal court cases to determine choice of law validity).

[31]*See, e.g.*, *Nat'l Equip. Rental, Ltd. v. Taylor*, 587 P.2d at 872.

The Court is satisfied at this juncture that Kansas has significant contacts with this dispute to satisfy due process. There is no question that The Mutual Fund Store was based in Kansas at the time Defendants entered into their employment agreements. Plaintiffs also allege that at least for a period, Defendants traveled to Kansas, received documents in Kansas, and reported to managers in Kansas. The computer servers that house Plaintiffs' customer data are located in Kansas. This is not a situation, as suggested by Defendants, where an employer specified the law of an entirely unconnected forum that favors restrictive covenants. And Defendants do not offer the Court authority to support their argument that the parties' past ties with Kansas have no bearing on constitutional significant contacts analysis; that if a party's contacts with a state dissipate over time, it can render a forum selection clause unenforceable. The Court is satisfied that Plaintiffs are substantially likely to succeed on the merits of their claim that enforcing the choice of law provision in the employment agreement does not offend the Constitution.

Next, assuming there is a conflict between Kansas and Louisiana law, Kansas applies the Restatement (First) of Conflict of Laws in addressing choice of law issues.[32] As the *Brenner* court explained, the First Restatement is silent as to contractual choice of law provisions, but "Kansas case law and the Uniform Commercial Code . . . recognize the principle of freedom to contract and, under most circumstances, permit parties to choose the law applicable to their agreement."[33] The general rule applies here because Defendants have not demonstrated that enforcing the choice of law provision would offend Kansas public policy. Moreover, as already discussed, Defendants have neither demonstrated that this Court is bound by the reasonable

[32] *See In re K.M.H.*, 169 P.3d 1025, 1031–32 (Kan. 2007).

[33] *Brenner*, 44 P.3d at 374.

relation test set forth in the Second Restatement, nor that Kansas is not reasonably related to the dispute.

Although Defendants stated at the hearing that Plaintiffs are not likely to succeed on the merits under Kansas law, they do not explain this argument, nor does their brief address any specific infirmity under Kansas law. The Court finds that Plaintiffs have met their burden of demonstrating serious questions on the merits of their breach of contract claim making it ripe for adjudication. Kansas courts look to the following factors to determine whether a restrictive covenant is reasonable, and therefore enforceable, under the particular facts of each case: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?"[34]

The covenants in sections 2 and 3 of Defendants' employment agreement protect legitimate business interest of Plaintiffs. Defendants were allowed to develop goodwill and business relationships in their capacity as TMFS agents; TMFS has a legitimate interest in disallowing them from obtaining an unfair advantage by taking those clients and confidential information about those clients when they leave. The Court also finds that the agreement does not place an undue burden on Defendants. The covenants do not prohibit them from working as financial advisers; they must only refrain from soliciting clients and employees for one year after resigning. There is no evidence to suggest that enforcing the employment agreements would be injurious to public welfare. And finally, the Court finds that the one-year period that applies to these restrictive covenants is reasonable. This time period is shorter than those commonly

[34] *Idbeis v. Wichita Surgical Specialists, P.A.*, 112 P.3d 81, 86–87 (Kan. 2005) (quoting *Weber v. Tillman*, 913 P.2d 84, 90 (Kan. 1996)).

upheld by Kansas courts.[35] In sum, Plaintiffs have demonstrated a substantial likelihood of success on their breach of contract claim, based on an employment agreement with enforceable choice of law and restrictive covenant provisions.

**D. Bond**

Fed. R. Civ. P. 65(c) provides that "[t]he Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court may exercise its discretion, and determine a bond is unnecessary "if there is an absence of proof showing a likelihood of harm."[36] Plaintiffs do not oppose a bond, and the Court finds that a bond is warranted. However, Defendants provided no information about the costs and damages that may inure to Defendants if Defendants are wrongly enjoined for the short period between today and a ruling on a motion for preliminary injunction. Plaintiffs shall post a bond in the amounts of $10,000 for Capace and $5000 for Zinsel.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Temporary Restraining Order (Doc. 6) is **granted**. Defendants Capace and Zinsel, and their officers, agents, servants, employees, and other persons acting in concert or participation with them (including Open Source) who receive actual notice of this Order by personal service or otherwise, are temporarily restrained and prohibited from, directly or indirectly:

a. violating the terms of the Agreement, including by soliciting, diverting, or taking away, or attempting to solicit, divert, or take away from TMFS, the business of TMFS's Customers for the purpose of selling or providing to or servicing for any such Customer any

[35] *See, e.g.*, *Wichita Clinic P.A. v. Louis*, 185 P.3d 946, 954–55 (Kan. Ct. App. 2008) (acknowledging that two-year time limits are commonly enforced yet enforcing three-year restrictive covenant).

[36] *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).

product or service which was provided by TMFS at any time during the last two years of Capace and Zinsel's employment with TMFS (or which product or service is a substitute therefor or competes therewith);

b. causing or attempting to cause any of TMFS's Customers to terminate or reduce their existing relationships with TMFS;

c. using, disclosing, copying, communicating, or distributing any of Plaintiffs' trade secret information or other Confidential Information;

d. avoiding or attempting to avoid providing discovery in this litigation by purging, destroying, altering, modifying or concealing any of TMFS's trade secret or other Confidential Information, whether in original, copied, computerized, handwritten or any other form;

e. processing paperwork or otherwise opening a new account for any TMFS Customers that Defendants may have already contacted.

Defendants are further ordered to immediately return any and all documents (including the TMFS customer lists that Defendants allegedly improperly took) containing any trade secret or other Confidential Information of TMFS or pertaining to TMFS's business, including, but not limited to all files, emails, text or instant messages, and other electronically stored documents and information taken or retained by Defendants, regardless of the form or medium in which it/they is/are stored or preserved (including, but not limited to, on a computer, thumb drive, flash drive, DVD or CD, "smart" phone, iPad, etc.), and whether in original, copied, computerized, handwritten or any other form.

Pursuant to Fed. R. Civ. P. 65(b), this restraining order shall remain in force for no longer than the Court's ruling on the propriety of a preliminary injunction, which is set for hearing on February 15, 2017, at 9:00 a.m. in Kansas City, Kansas, Courtroom 427.

Plaintiffs shall post a security bond in the amounts of $10,000 for Capace and $5000 for Zinsel.

**IT IS SO ORDERED.**

Dated: February 7, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE